Date signed February 25, 2010



JAMES F. SCHNEIDER
U. S. BANKRUPTCY JUDGE

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND

In re:                              *

FIELDSTONE MORTGAGE CO.,            *          Case No. 07-21814-JS

    Debtor                          *          Chapter 11

*   *   *   *   *   *   *   *   *   *   *   *   *

***MEMORANDUM OPINION DENYING MOTION TO AUTHORIZE DEBTOR
TO MAKE KEY EMPLOYEE RETENTION PAYMENTS
[ON REMAND FROM THE UNITED STATES DISTRICT COURT ]***

Before the Court is the motion of the Chapter 11 debtor to authorize key employee retention payments ("KERP") to seven employees. This matter came on for hearing upon remand from the United States District Court for the District of Maryland (Blake, D.J.). Having been found to be officers of the debtor, and therefore insiders, the issue on remand is whether any of the seven employees are able to satisfy the limitations set forth in Section 503(c)(1) in order to receive payments under the

KERP.¹  For the following reasons, this opinion holds that the limitations have not been met and therefore the debtor's motion will be denied.

## FINDINGS OF FACT

1. "Fieldstone Mortgage Company ("Fieldstone"), the debtor in this case, was a national mortgage banking company that originated and sold conforming and non-conforming residential mortgage loans secured by residential real estate.  In 2006, it originated approximately $5.5 billion of mortgage loans.  As of July 31, 2007, it had about 1,200 employees.  Due to problems in the mortgage market that became apparent in 2006, Fieldstone faced increasing liquidity difficulties, and ultimately had to file for Chapter 11 bankruptcy.  At the time it filed for bankruptcy, November 23, 2007, its workforce had been reduced to about 50-60 employees."  *Office of U.S. Trustee v. Fieldstone Mortg. Co.*, 2008 WL 4826291 at *1.

---

¹This Court is bound by Judge Blake's finding that the seven employees for whom the KERP payments were intended are officers, and therefore insiders, regardless of the view that, "When everyone is somebody, then no one's anybody." William S. Gilbert, "There Lived a King," from *The Gondoliers* (1889).  In bankruptcy, this view does not prevail "when everyone is a vice president." *See. e.g., In re Foothills Texas, Inc.*, 408 B.R. 573, 584 (Bankr. D. Del. 2009) (Vice presidents of debtor corporation failed to rebut the presumption that they were officers and therefore "statutory insiders.")  In her opinion, Judge Blake noted that "Fieldstone at one point employed approximately 60 persons with the title Vice President," citing the debtor's Statement of Financial Affairs. *Id.*, fn. 10.  All seven employees were reported by Fieldstone as officers and were also listed as insiders in the debtor's Statement of Financial Affairs.  All seven were board-appointed officers who exercised control over various facets of Fieldstone's corporate operations.

2. On January 10, 2008, Fieldstone filed the instant motion, entitled "Motion for Order Authorizing Debtor to Implement Employee Incentive Plan Pursuant to Sections 105, 363 and 503 of the Bankruptcy Code" [P. 121], in which it requested authority to implement an employee incentive plan for 23 of its remaining employees. Despite the pleading's title, the body of the motion referred to "the need for the retention program," the purpose of which was to permit the debtor to pay bonuses to certain valued employees to retain their continuing services during the pendency of the instant Chapter 11 bankruptcy case in order to facilitate its reorganization.

3. The motion contained the following averment:

> As the debtor dealt with its liquidity crisis and the eventual filing of its bankruptcy case, it devised a retention program that it believed necessary to retain and incentivize employees needed to maintain the operations of the Debtor. In preparation for the filing of its case the Debtor negotiated a Post-Petition Loan and Security Agreement (the "DIP Loan") with C-Bass. As part of the DIP Loan and the budget appended thereto, certain portions of the payments needed to fund the retention program were provided for. ***Thus, the retention program and certain funding for it have been approved.*** The Debtor now files this motion, out of an abundance of caution, to obtain final approval of the retention program.

Motion, Paragraph 9 [emphasis supplied].

4. The Office of the United States Trustee opposed the motion and argued that because some of the employees affected by the KERP were officers, they were

"insiders" pursuant to Section 101(31)(B) of the Bankruptcy Code,[2] subject to the conditions set forth in Section 503(c)(1).[3]

---

[2]Section 101(31)(B) provides as follows:

(31) The term "insider" includes –

    (B) if the debtor is a corporation –

        (i) director of the debtor;

        (ii) officer of the debtor;

        (iii) person in control of the debtor;

        (iv) partnership in which the debtor is a general partner;

        (v) general partner of the debtor; or

        (vi) relative of a general partner, director, officer, or person in control of the debtor[.]

11 U.S.C. § 101(31)(B).

[3]Section 503(c) provides as follows:

### § 503. Allowance of administrative expenses.

(c) Notwithstanding subsection (b), there shall neither be allowed, nor paid–

(1) a transfer made to, or an obligation incurred for the benefit of, an insider of the debtor for the purpose of inducing such person to remain with the debtor's business, absent a finding by the court based on evidence in the record that–

5. In response to the objection, Fieldstone reduced the number of retained employees to the following seven, each of whom was a management person in charge of his or her department:

(1) Jennifer Bliden, Vice President of Systems, who was responsible for all of the computing systems at Fieldstone and maintenance of its firewalls;

---

    (A) the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business at the same or greater rate of compensation;

    (B) the services provided by the person are essential to the survival of the business; and

    (C) either–

        (i) the amount of the transfer made to, or obligation incurred for the benefit of, the person is not greater than an amount equal to 10 times the amount of the mean transfer or obligation of a similar kind given to nonmanagement employees for any purpose during the calendar year in which the transfer is made or the obligation is incurred; or

        (ii) if no such similar transfers were made to, or obligations were incurred for the benefit of, such nonmanagement employees during such calendar year, the amount of the transfer or obligation is not greater than an amount equal to 25 percent of the amount of any similar transfer or obligation made to or incurred for the benefit of such insider for any purpose during the calendar year before the year in which such transfer is made or obligation is incurred[.]

11 U.S.C. § 503(c)(1).

(2) Thomas Brennan, Vice President and Acting General Counsel, who reviewed all of the legal documentation generated by and for Fieldstone and helped to oversee Fieldstone litigation across the country;

(3) John Camp, Senior Vice President and Chief Information Officer, whose duties included the protection of data involving $12 million in investments;[4]

(4) Nancy Maradie, Vice President and Assistant Secretary Treasurer, who paid all vendors and employees of Fieldstone and managed its cash;

(5) Theresa McDermott, Senior Vice President and Controller, who reported requirements for the company such as SOFA;

(6) Jacqueline Smith (now Malone), Vice President of Licensing, who maintained all of Fieldstone's licensing to buy and sell mortgages and surety bonds in all 50 states; and

(7) William Wolfe, Vice President of Facilities, who provided and maintained equipment for over 90 Fieldstone offices across the country.

6. Fieldstone argued that the seven employees were essential to the debtor's successful completion of this Chapter 11 case because of their expertise and

---

[4]The U.S. Trustee withdrew his objection to the KERP as to Messrs. Brennan and Camp, because they each received a *bona fide* competing job offer at the time the retention motion was filed. Both accepted the offers and are no longer employed by the debtor. Line Withdrawing Objection [P. 1377] filed July 17, 2009.

institutional knowledge and that the failure to retain them would result in substantial delay in the Chapter 11 process and increase the debtor's administrative expenses. The debtor alleged that it would be far more expensive to engage outside services and contractors to conduct the same services than to retain the existing employees.

7. The proposed KERP treats all remaining employees the same and is multiplied against each retained employee's respective salary to arrive at the incentive numbers. Affected employees can receive a bonus equal to two months' salary for as long as they remain in the debtor's employ.

8. On February 20, 2008, this Court heard arguments on the motion and held that the bonuses were permissible because the seven key employees were not officers in the traditional sense and therefore were not insiders under § 503(c)(1). The motion was approved by order [P. 259] entered on February 27, 2008. The U.S. Trustee appealed the decision.

9. On appeal, the U.S. District Court reversed.[5] In her memorandum opinion and order [PP. 1127 and 1128] dated November 5, 2008, Judge Catherine C. Blake found that the employees were indeed officers and therefore were insiders, prohibited from receiving retention bonuses unless certain specific conditions were satisfied.

---

[5]This matter was remanded by amended order [P. 1144] dated November 21, 2008.

7

10. Judge Blake based her decision on the following factors: (1) each officer was appointed by the board of directors and (2) their titles, duties and identification as officers and insiders were specified in the company's bankruptcy filings.[6]

---

[6]*See, contra, In re CEP Holdings, LLC*, 2006 WL 3422665 (Bankr. N.D. Ohio 2006) (because title is not determinative of whether an employee is an officer, opinion approved bonus plan, holding that vice presidents and chief financial officer were not officers for purposes of Section 503(c)); *NMI Systems, Inc. v. Pillard (In re NMI Systems, Inc.)*, 179 B.R. 357 (Bankr. D. D.C. 1995) ("seminal case" defining "officer" under Section 101(31), holding that debtor's vice president was not an officer on the sole basis of his title, and therefore not an insider for purposes of recovering a preference.). In *NMI*, Judge S. Martin Teel stated that "the appropriate test for whether [the defendant] was an officer is whether [he] occupied a high position within the corporation making him active in setting overall corporate policy or performing other important executive duties of such a character that it is likely that he would be accorded less than arms-length treatment in the payment of his antecedent claim against the debtor. The term 'officer' obviously includes anyone holding a position in which that person controls the decision whether to pay an antecedent claim. But it is broader and includes, for example, those in the collective group exercising overall authority regarding the debtor's corporate decisions who, as members of that insider group, are in a position to exert undue influence over corporate decisions regarding payment of their claims in tight financial times including those who are privy to critical information regarding the debtor's financial stability and able to act to their advantage on the basis of such information." 179 B.R. at 369-70. *See also, Smith v. Ruby (In re Public Access Technology.com, Inc.)*, 307 B.R. 500 (E.D. Va. 2004) (whether a former owner of company that merged with debtor who had been given title of executive vice president was an officer of the debtor for purposes of recovering preference was a genuine issue of material fact that precluded granting summary judgment); and *Principal Mutual Life Insurance Co. v. Lakeside Associates, L.P. (In re DeLuca)*, 194 B.R. 797, 803 (Bankr. E.D. Va. 1996) ("In order to qualify under the rubric of being 'in control of the debtor', the alleged insider 'must exercise sufficient authority over the debtor so as to unqualifiably dictate corporate policy and the disposition of corporate assets,' " citing *Butler v. David Shaw, Inc.*, 72 F.3d 437, 443 (4th Cir.1996).

11. In support of her legal conclusions, Judge Blake made the following factual findings:

> With respect to the job responsibilities of these seven employees in particular, Mr. Sonnenfeld said that they were the heads of their respective departments. Ms. Bliden was responsible for all of the computing systems at Fieldstone (which was a computer-driven company) and the maintenance of its firewalls. Mr. Brennan, as acting general counsel, reviewed all of the legal documentation generated by and for Fieldstone. He also helped oversee Fieldstone litigation across the country. Mr. Camp's position required him to protect data involving $12 million in investments. Ms. Maradie's position involved paying all vendors and employees of Fieldstone, and generally managing its cash. *Id.* Ms. McDermott performed all of the reporting requirements for the company, for instance its statements of financial affairs. Ms. Smith's position involved maintaining Fieldstone's licenses (to buy and sell mortgages) and surety bonds in all 50 states. Mr. Wolfe's position involved providing and maintaining equipment for over 90 Fieldstone offices across the country. Since Fieldstone has begun operating in bankruptcy, his position has involved selling Fieldstone's assets across the remaining offices, including negotiating court-approved asset sales. In short, Mr. Sonnenfeld's testimony demonstrated that each of the seven individuals were board-appointed officers who exercised extensive control over various facets of Fieldstone's corporate operations.

*Id.*. (Citations and paragraph numbers omitted.)

12. Meanwhile, on July 14, 2008, the debtor's revised plan of reorganization [P. 826] was confirmed by order of this Court [P. 840], which resulted in a successful

sale of all of the debtor's stock to Planet Financial Group, LLC, ("Planet") a Delaware corporation, for a price of $1.2 million.[7]

## CONCLUSIONS OF LAW

1. Prior to BAPCPA,[8] "it [was] common . . . for bankruptcy courts to approve the adoption of post-petition KERPs, or the assumption of pre-petition KERPS, if the debtor [had] used 'proper business judgment. . . '" *In re U.S. Airways, Inc.*, 329 B.R. 793, 797 (Bankr. E.D. Va. 2005).

2. However,"[r]ecently, Congressional concern over KERP excesses was clearly reflected in changes to the Bankruptcy Code that are effective for cases filed after October 17, 2005." *In re Dana Corp.*, 351 B.R. 96, 100 (Bankr. S.D. N.Y. 2006). *See* Hage and Mohan, "Recent Developments in Section 503 - Allowance of Administrative Expenses," 2009 NORTON ANNUAL SURVEY OF BANKRUPTCY LAW, 561-66.

---

[7]The question of whether the appeal of this matter to the United States District Court was equitably mooted by the confirmation and consummation of the debtor's plan during the pendency of the appeal was not raised by the -parties on remand. *Cf. Retired Pilots Assoc. of U.S. Airways, Inc. v. U.S. Airways Group, Inc. (In re U.S. Airways Group, Inc.)*, 369 F.3d 806 (4th Cir. 2004).

[8]The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 331, 119 Stat. 23, 102-03 (April 20, 2005).

3. Since BAPCPA went into effect, Section 503(c)(1) has provided stringent requirements that must be proven in order to obtain bankruptcy court approval of such plans. Accordingly, before this Court may approve KERP payments by a debtor in possession (in the form of a transfer or an obligation) to an insider for the purpose of retaining his or her employment during the pendency of the case, the Court must find from the evidence in the record that the debtor has satisfied the statutory requirements.[9]

4. The debtor as proponent of the KERP bears the burden of demonstrating that the proposed retention plan meets the requirements under § 503(c). *In re Global Home Products, LLC*, 369 B.R. 778, 785 (Bankr. D. Del. 2007) ("The statute makes it abundantly clear that in a post-BAPCA bankruptcy case, KERPs and severance arrangements subject to review under §503(c) – those whose purpose is to retain employees – are severely restricted.").[10]

---

[9]Thus, Section 503(c)(1) is not an outright prohibition of the approval of a KERP, despite the extraordinary evidentiary burdens imposed by the statute.

[10]Despite these statutory strictures regarding KERPs, payments made to key employees pursuant to what were characterized as "incentive plans" have received court approval, even when the key employees were officers. *See, for example*, *In re Journal Register Co.*, 407 B.R. 520 (Bankr. S.D. N.Y. 2009), where the court approved an employee incentive plan provided for in a confirmed Chapter 11 plan as not violative of Section 503(c) because its purpose was not the retention of key employees; *In re Nellson Nutraceutical, Inc.*, 369 B.R. 787 (Bankr. D. Del. 2007) (employee incentive plan for payment of bonuses to senior management was approved

5.  The first requirement is that "the transfer or obligation is essential to retention of the person because the individual has a bona fide job offer from another business[11] at the same or greater rate of compensation."  Section 503(c)(1)(A). According to its plain meaning, this clause requires that unless the KERP is allowed to be proposed, a key employee will voluntarily leave the debtor's employment because the employee has received a firm, good faith offer to work for a different employer for at least the same or greater compensation.  Thus, the Court must evaluate

---

by bankruptcy court as complying with requirements of Section 503(c)). *But see In re Nellson Nutraceutical, Inc.*, 2008 WL 4532514 (D. Del. 2008), where the district court denied debtor/appellee's motion to dismiss appeal on grounds of equitable and constitutional mootness where payments had already been made, holding that disgorgement of payments could nevertheless be granted if appeal were successful, despite appellant's failure to obtain stay pending appeal; *Official Committee of Unsecured Creditors v. Airway Industries, Inc. (In re Airway Industries, Inc.)*, 354 B.R. 82, 87 n. 12 (Bankr. W.D. Pa. 2006) (incentive bonuses to insiders funded by secured creditor were not property of the estate subject to turnover and not prohibited by Section 503(c)); and *In re Nobex Corp.*, 2006 WL 4063024 (Bankr. D. Del. 2006) ("sale-related incentive pay" to senior managers is not governed by Section 503(c)(1) and (2) and not prohibited by Section 503(c)(3)).  In a different context, *see In re Pilgrim's Pride Corp.*, 401 B.R. 229 (Bankr. N.D. Tex. 2009) (holding that consulting, noncompetition agreements with former officers to prevent them from being employed by debtor's competitors were not in the nature of retention agreements because officers would no longer be employed by the debtor).  The debtor has not made a convincing argument that the payments made in the instant case were incentive as opposed to being strictly retentive in nature.

[11]This Court interprets the phrase, "from another business," to imply that the offer must come from a different business operation than that of the debtor.

(1) the employee's intention to leave unless the KERP is approved;[12] (2) whether the employee's reason for leaving is because the employee received a valid offer of employment from someone other than the debtor;[13] and (3) whether the offer was at least as valuable or more valuable[14] than that proposed by the KERP.[15]

      6.    At the first hearing before this Court, the debtor proved through the testimony of Mr. Sonnenfeld that these employees were essential to the business. He also testified that it would be more costly to retain outside services and contractors to conduct the same services that these employees perform.

---

[12] This requirement that the KERP was the *quid pro quo* for continuing to be employed by the debtor could be proven easily, on the key employee's own "say-so," except that the threat of leaving is tied to and made co-dependent upon a second cause, namely the receipt of another offer of employment from someone else.

[13] This clause would seem to indicate that the key employee is required to "shop the KERP around" in order to receive a KERP as a retained employee of a debtor in possession. For commentary critical of this provision, *see* Dorothy Hubbard Cornwell, *To Catch a Kerp: Devising A More Effective Regulation Than § 503(c)*, 25 EMORY BANKR. DEV. J. 485, 501-2 (2009).

[14] The phrase "greater rate of compensation" is superfluous if the purpose of the statutory requirement is that the proponent demonstrate that the amount of the KERP has been tested in the market and has thereby been objectively demonstrated to be fair and reasonable, namely the result of "arm's length" negotiation.

[15] In an unpublished opinion, Chief Judge Keir of this Court held that "stay bonuses" can be authorized to be paid if the services provided by the person are essential to the survival of the business and the employee received a *bona fide* job offer. *In re Chesapeake Knife and Tool Co., Inc.*, 2006 WL 4671820 (Bankr. D. Md. 2006).

7. The debtor has also presented evidence through the testimony of Ms. McDermott that the payments met the limitations in Section 503(c)(1)(C), namely that the payments are not greater than 10 times the amount of the mean transfer given to non-management employees for any purpose during the calender year, or if no such similar transfers were made to such non-management employees during such calender year, the amount of the payment is not greater than 25% of the amount of any similar transfer to such insider during the calender year before the year in which such transfer is made.  11 U.S.C. § 503(c)(1)(C)(i).

8. Counsel for the debtor argued that the requirement of a *bona fide* job offer has been met because Planet, the purchaser of the debtor's stock under the confirmed plan, has agreed to offer the key employees the same compensation as that proposed by the KERP.  While Planet is a different entity from the debtor, it would seem that the Planet offer was not from a different business, or in competition with the KERP, because as the purchaser of the debtor's business under the Plan, Planet's "business" is the same as that of the debtor.  Planet merely agreed to match the KERP in order to ensure that key employees would continue to work for the reorganized debtor after the Planet takeover.  As such, the Planet offer does not satisfy the statute's purpose of testing the value of the KERP as a competing offer.  The failure to present such a competing offer forecloses the approval of the motion on remand.

9. The debtor has not explained the basis for its statement (quoted in Finding of Fact No. 3 from Paragraph 9 of the KERP motion [P. 121]) that court approval of the KERP was unnecessary because the Court already approved the payments contained in the budget in the DIP Loan. Contrary to the debtor's statement, in the opinion of this Court, the consent of the debtor-in-possession's lender to fund KERP payments did not excuse the debtor from complying with the specific requirements of the Bankruptcy Code.

***ORDER ACCORDINGLY.***

cc:    Joel I. Sher, Esquire
Shapiro Sher Guinot & Sandler
36 S. Charles Street, Suite 2000
Baltimore, Maryland  21201
Counsel to the Debtor

Mark A. Neal, Esquire
 Hugh M. Bernstein, Esquire
Katherine A. Levin, Esquire
Office of the United States Trustee
101 W. Lombard Street, Suite 2625
Baltimore, Maryland  21201

Peter S. Partee, Esquire
Richard P. Norton, Esquire
Hunton & Williams LLP
200 Park Avenue, 53rd Floor
New York, New York 10166
Counsel to Credit Based Asset Servicing and Securitization LLC

Christopher J. Giaimo, Jr., Esquire
Jeffrey N. Rothleder, Esquire
Arent Fox, LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036-5339

Robert M. Hirsch, Esquire
Leah M. Eisenberg, Esquire
Arent Fox, LLP
1675 Broadway
New York, New York 10019
Counsel to the Official Committee of Unsecured Creditors