Date signed March 22, 2010



**JAMES F. SCHNEIDER**
**U. S. BANKRUPTCY JUDGE**

## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND

In re:                              *

FIELDSTONE MORTGAGE CO.,        *          Case No. 07-21814-JS

           Debtor       *                   Chapter 11

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

### MEMORANDUM OPINION DENYING APPLICATION OF MOODY'S WALL STREET ANALYTICS, INC., FOR ADMINISTRATIVE EXPENSE CLAIM

This matter is before the Court upon the objection of the Fieldstone Mortgage Company Plan Trust to the application of Moody's Wall Street Analytics, Inc., for an administrative expense claim. For the reasons stated, the objection will be sustained and the application for administrative expense claim will be denied.

### SUMMARY OF OPINION BY THE COURT

This Chapter 11 debtor rejected executory software licensing and service agreements to which its parent corporation was a party, but to which the debtor was not. After the debtor's plan was confirmed, the plan trustee objected to the application for administrative claim filed by a software licensor for breach of the rejected

contracts.  The grounds for objection were (1) that because the debtor was not a party to the contracts, the court order that approved their rejection was a nullity; (2) that the plan trustee was not bound by the debtor's rejection of executory contracts to which the debtor was not a party; and (3) the claimant did not prove that it was damaged by the rejection of the contracts.

The holdings of this opinion are as follows:

(1) Regardless of the fact that the debtor was not a party to an executory contract, the debtor may reject the contract in the exercise of its sound business judgment based upon the reasonable belief that the debtor might be liable for performance of the contract; (2) a debtor's rejection of an executory contract is not an acknowledgment of indebtedness *per se*; and while such rejection may give rise to an unsecured claim and/or an administrative claim against the bankruptcy estate for breach of contract, the party that asserts the administrative claim bears the burden of proving both damages and the debtor's obligation to perform the contract, particularly where the debtor is not a party to the rejected contract, but might be liable on some other basis; (3) the debtor's rejection in and of itself of an executory contract to which it was not a party does not give rise to a claim for damages against the debtor unless the debtor was obligated to perform the contract and the debtor's rejection thereof caused damage to the claimant.

2

**FINDINGS OF FACT**

1.   On November 23, 2007, the debtor, Fieldstone Mortgage Company ("FMC"), filed a voluntary Chapter 11 bankruptcy petition in this Court.

2.   The following history of the operations of the company is contained in the debtor's disclosure statement [P. 483], filed on April 28, 2008:

> Fieldstone's[1] business primarily consisted of originating residential mortgage loans throughout the United States, working either directly with borrowers or through mortgage brokers. Fieldstone sold all of the loans it originated, either in the secondary market to third parties in competitive bids or, for certain pre-defined loans, on a flow basis to Fieldstone Investment Corporation ("FIC"), its former parent company. Fieldstone was licensed as a residential mortgage originator in all 50 states and at one time had over 70 offices throughout the United States, including 16 regional operations centers. Fieldstone was founded in 1995 by Michael Sonnenfeld, President and CEO, and is headquartered in Columbia, Maryland.
>
> FIC held the mortgage loans it acquired from Fieldstone in an investment portfolio and financed the portfolio with a combination of its shareholders' equity and permanent financing in the form of mortgage-backed securities issued through major Wall Street investment banks in periodic securitizations. FIC was structured as a real estate investment trust, or REIT, for federal income tax purposes and it elected for Fieldstone to be treated as a taxable REIT subsidiary of FIC in order to improve the tax treatment of Fieldstone's revenue from the sale of mortgage loans. FIC was formed to be the owner of Fieldstone in early 2003, raised $700 million of equity in the fourth quarter of 2003 in a private placement under Rule 144A and listed its shares on the NASDAQ National Market under the symbol "ICC" in the first quarter

---

[1]In the disclosure statement quoted here, the use of the name "Fieldstone" denotes "FMC."

of 2005.  On February 15, 2007, FIC entered into an Agreement of Merger with Credit-Based Asset Servicing and Securitization LLC ("C-BASS").  On July 17, 2007, C-BASS paid $4.00 per share for all of the outstanding shares of FIC, and the merger between FIC and C-BASS closed.  C-BASS reorganized FIC's business so that FIC was merged into a subsidiary of C-BASS and Fieldstone became and remains a wholly-owned subsidiary of C-BASS.

Disclosure statement, 8-9 [P. 483].

3.  On April 14, 2008, FMC filed a plan of reorganization [P. 419], and a revised plan ("the Plan") [P. 826] on July 11, 2008.

4.  On July 14, 2008, this Court confirmed the Plan by order [P. 840].

5.  The effective date of the Plan was July 31, 2008, pursuant to § 1.32 of the Plan.[2]

6.  The FMC Plan Trust was created pursuant to § 5.10 of the Plan as of the effective date for the purpose of effectuating certain provisions of the Plan, including

---

[2]Section 1.32 of the Plan provided, as follows:

**Effective Date** means the date that is eleven (11) calendar days after the Confirmation Date, or, if such date is not a Business Day, the next succeeding Business Day, so long as no stay of the Confirmation Order is in effect on such date; provided, however that if, on or prior to such date, all conditions to the Effective Date set forth in this Plan have not been satisfied, or waived, then the Effective Date shall be the first Business Day following the day on which such conditions to the Effective Date have been satisfied or waived.

*Id.*  The Notice of Effective Date [P. 985], dated August 8, 2008, stated that the effective date of the Plan was July 31, 2008.

4

liquidation of all liabilities and claims against the debtor or remaining claims of the debtor; liquidation of Plan assets and Plan Trust assets; making distributions under the Plan; and the prosecution and settlement of objections to claims. The Plan conferred upon the Plan Trust standing and capacity to institute certain causes of action, including avoidance actions, and to compromise and settle any issue or dispute regarding the amount, priority, treatment or allowance of any claims. Plan, § 5.10.

7. Section 2.2 of the Plan provided that "[p]roofs of Administrative Expense Claims and/or requests for the allowance and payment of Administrative Expense Claims, other than a Fee Claim, . . . must be filed and served by the date that is no later than forty-five (45) days after the Effective Date." *Id*.

8. Accordingly, on September 5, 2008, within 45 days of the effective date, Moody's Wall Street Analytics, Inc. ("Moody's") filed the instant application [P. 1024] for the allowance and payment of an administrative expense claim in the amount of $45,338.76, pursuant to Section 503 of the Bankruptcy Code.[3]

---

[3]Administrative expenses are enumerated in Section 503(b), as follows:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section 502(f) of this title, including –

(1)(A) the actual, necessary costs and expenses of preserving the estate including–

(i) wages, salaries, and commissions for services rendered after the commencement of the case; and

(ii) wages and benefits awarded pursuant to a judicial proceeding or a proceeding of the National Labor Relations Board as back pay attributable to any period of time occurring after commencement of the case under this title, as a result of a violation of Federal or State law by the debtor, without regard to the time of the occurrence of unlawful conduct on which such award is based or to whether any services were rendered, if the court determines that payment of wages and benefits by reason of the operation of this clause will not substantially increase the probability of layoff or termination of current employees, or of nonpayment of domestic support obligations, during the case under this title;

(B) any tax –

(i) incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title; or

(ii) attributable to an excessive allowance of a tentative carryback adjustment that the estate received, whether the taxable year to which such adjustment relates ended before or after the commencement of the case;

(C) any fine, penalty, or reduction in credit relating to a tax of a kind specified in subparagraph (B) of this paragraph; and

(D) notwithstanding the requirements of subsection (a), a governmental unit shall not be required to file a request for the payment of an expense described in subparagraph (B) or (C), as a condition of its being an allowed administrative expense;

(2) compensation and reimbursement awarded under section 330(a) of this title;

(3) the actual, necessary expenses, other than compensation and reimbursement specified in paragraph (4) of this subsection, incurred by–

(A) a creditor that files a petition under section 303 of this title;

(B) a creditor that recovers, after the court's approval, for the benefit of the estate any property transferred or concealed by the debtor;

(C) a creditor in connection with the prosecution of a criminal offense relating to the case or to the business or property of the debtor;

(D) a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders other than a committee appointed under section 1102 of this title, in making a substantial contribution in a case under chapter 9 or 11 of this title;

(E) a custodian superseded under section 543 of this title, and compensation for the services of such custodian; or

(F) a member of a committee appointed under section 1102 of this title, if such expenses are incurred in the performance of the duties of such committee;

(4) reasonable compensation for professional services rendered by an attorney or an accountant of an entity whose expense is allowable under subparagraph (A), (B), (C), (D), or (E) of paragraph (3) of this subsection, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case

under this title, and reimbursement for actual, necessary expenses

7

incurred by such attorney or accountant;

(5) reasonable compensation for services rendered by an indenture trustee in making a substantial contribution in a case under chapter 9 or 11 of this title, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title;

(6) the fees and mileage payable under chapter 119 of title 28;

(7) with respect to a nonresidential real property lease previously assumed under section 365, and subsequently rejected, a sum equal to all monetary obligations due, excluding those arising from or relating to a failure to operate or a penalty provision, for the period of 2 years following the later of the rejection date or the date of actual turnover of the premises, without reduction or setoff for any reason whatsoever except for sums actually received or to be received from an entity other than the debtor, and the claim for remaining sums due for the balance of the term of the lease shall be a claim under section 502(b)(6);

(8) the actual, necessary costs and expenses of closing a health care business incurred by a trustee or by a Federal agency (as defined in section 551(1) of title 5) or a department or agency of a State or political subdivision thereof, including any cost or expense incurred–

(A) in disposing of patient records in accordance with section 351; or

(B) in connection with transferring patients from the health care business that is in the process of being closed to another health care business; and

(9) the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the

goods have been sold to the debtor in the ordinary course of such

9.  The application recited that the debtor and Moody's entered into software licensing and service agreements for three years effective March 30, 2005, that granted the debtor a non-exclusive, non-transferable license to use Moody's intellectual property, namely software known as the "Structured Finance Workstation," "Bond Administration Work Module" and the "Portfolio Management Work Station."  Application, ¶¶ 6 and 7.  The application also alleged that the debtor paid the initial fees and the quarterly fees as required through September 2007, but that it did not tender any payments for the fourth quarter (October-December 2007) and that it failed to make any additional payments through the date the debtor rejected the contracts.  Application, ¶8.

10.  Both agreements provided that their provisions were governed by the laws of the State of New York.  License Agreement, ¶ 18, FMC Plan Trust Exhibit A; Service Agreement, ¶¶ 11-27, FMC Plan Trust Exhibit B.

11.  Contrary to the allegations set forth in the application, FMC was *not* the contracting party named in either of the agreements, in both of which the obligor was FIC, the debtor's former parent company.  Agreements, FMC Plan Trust Exhibits A

---

debtor's business.

11 U.S.C. § 503(b).

and B.[4]  In fact, all payments tendered to Moody's pursuant to the agreements were made by FIC; none was made by FMC.  Cancelled checks, FMC Plan Trust Exhibit D.  All invoices from Moody's were made out in the name of FIC and not that of the debtor, FMC.  Invoices, FMC Plan Trust Exhibit C.

12.  Paragraph 4 of Appendix P to the license agreement provided, as follows:

> **4.   Authorized Users:** Authorized users are the following: Employees of Licensee.

Appendix P to License Agreement, ¶ 4, FMC Plan Trust Exhibit A.  FIC was the licensee.

13.  Paragraph 23 of the license agreement provided, as follows:

> **23. Successors.**  This Agreement shall inure to the benefit of and bind the parties hereto and their permitted successors and legal representatives, as WSA's [Moody's] assigns.

License Agreement, ¶ 23, FMC Plan Trust Exhibit A

14.   In January 2008, Moody's demanded payment by the debtor of postpetition fees due under the agreements.

15.  On February 11, 2008, the debtor filed an omnibus motion to reject executory agreements [P. 219], that referred to executory software licensing

---

[4]Both agreements were signed on behalf of FIC by John C. Kendell.  FMC Plan Trust Exhibit A at 13; FMC Plan Trust Exhibit B at 8.  John C. Kendell was FIC's senior vice president of investment portfolio and was not an employee of FMC.  Transcript at 24:24-25, 25:1-4.  FIC is not a debtor in this Court or elsewhere.

agreements with "Wall Street Analytics, Inc."  On May 1, 2008, the debtor filed an

amended motion to reject executory agreements [P. 501], that also referred to

executory agreements with "Wall Street Analytics, Inc."[5]

16.  On June 3, 2008, this Court granted the amended motion to reject executory

contracts by order [P. 583].  The order provided that the executory contracts being

rejected were deemed rejected as of February 11, 2008, the date the debtor filed its

first rejection motion.

17.  On September 25, 2008, the FMC Plan Trust filed an objection [P. 1063]

to Moody's administrative claim application.  The objection alleged that the debtor

was not a party to the executory contracts with Moody's, but rather that the obligor

was FIC.  The second ground for the objection was that the documentation submitted

by Moody's was insufficient to support a claim for administrative expenses.  The Plan

Trust asserted that in the event Moody's had a claim against the debtor for the

rejection of executory contracts, the claim would be an unsecured claim rather than

an administrative claim.  *Id.*

18.  Representatives of FMC testified that the inclusion of Moody's contract

with FIC in the list of executory contracts was based upon the advice of debtor's

---

[5]The application for administrative expense reported that debtor's counsel
confirmed that the amended motion to reject executory contracts encompassed both
the licensing and service agreements with Moody's.  Application, ¶9.

counsel to list all executory contracts, regardless whether such contracts were FMC or FIC contracts. Transcript at 9:1-5. The reason for the inclusion of the contract was "to wrap everyone up, to the extent there [were] any potential claims." Transcript at 9:8-10.

19. Unbeknownst to FMC, on the date the rejection motions were filed, the software and computer equipment subject to Moody's software agreements were stored in boxes on the premises occupied by FMC and FIC. Witnesses called by the Plan Trust testified that FMC did not use the software in its operations, that none of the employees of FMC were trained to use the software and that they were unaware that the equipment existed or where it was. Most of the items were returned to Moody's after they were located by the employees of FMC.

## *CONCLUSIONS OF LAW*

### *JURISDICTION AND VENUE*

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334 to consider the objection of the Plan Trust to Moody's application for administrative claim, which is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I). Venue is appropriate pursuant to 28 U.S.C. § 1409.[6]

---

[6]This is a contested matter because the claimant has filed an administrative expense claim to which the Plan Trust has objected, within the core subject matter jurisdiction of the bankruptcy court because it relates to the allowance or disallowance

## EXECUTORY AND NON-EXECUTORY CONTRACTS

2.  While the Bankruptcy Code does not define the term "executory contract," courts have generally adopted the definition of executory contracts formulated by Professor Vern Countryman to include those contracts under which the "'obligations of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other.'"   Countryman, *Executory Contracts in Bankruptcy*: *Part I*, 57 Minn. L. Rev. 439, 460 (1973)), quoted in *RCI Tech. Corp. v. Sunterra Corp. (In re Sunterra Corp.)*, 361 F.3d 257, 264 (4th Cir. 2004).   The operative date for determining whether a contract is executory or non-executory is the petition date.

"Countryman divided potentially executory contracts into three categories: (1) those in which the non-bankrupt has performed fully, (2) those in which the bankrupt

———————————————

of claims.  Therefore, whether or not the agreements were properly rejected does not detract from this Court's subject matter jurisdiction to decide the claims objection. Jurisdictionally, the two issues are independent.  The rejection of the contract is *res judicata* by reason of the entry of a final, non-appealable order,  *In re UAL Corp.*, 411 F.3d 818, 821-2 (7th Cir. 2005)*; Dynamic Changes Hypnosis Ctr., Inc. v. PCH Holding, LLC*, 306 B.R. 800, 806-7 (E.D. Va. 2004), and the confirmation of the debtor's plan finalized the rejection. 11 U.S.C. § 1141(a);  *First Union Commercial Corp. v. Nelson, Mullins, Riley and Scarborough (In re Varat Enterprises, Inc.)*, 81 F.3d 1310, 1314-15 (4th Cir.1996) (confirmation order is a final judgment with *res judicata* effect).

has performed fully and (3) those in which neither party has performed fully." *Gloria Mfg. Corp. v. Internat'l Ladies' Garment Workers' Union*, 734 F.2d 1020, 1022 (4th Cir.1984). Countryman went on to define contracts in which performance remains due either from the debtor or the non-debtor party as non-executory.[7] Within the category of non-executory contracts are two sub-groups: (1) non-executory contracts in which the performance of the debtor remains due, which are treated as a liability of the bankruptcy estate, affording the non-debtor party the right to file an unsecured, prepetition claim in the bankruptcy case, *see Kucin v. Devan*, 251 B.R. 269, 271-72 (D. Md. 2000); and (2) a non-executory contract in which performance remains due from the non-debtor party, which by contrast is an asset of the bankruptcy estate.[8]

---

[7]Non-executory contracts that have been fully performed by both parties are not included in this analysis.

[8]". . [F]irst consider the situation in which a contract has been fully performed by one party. Assume the bankruptcy debtor has a contract to supply widgets to a purchaser. The debtor has provided all the widgets called for under the contract, but has not been paid. The claim for payment due against the counterparty purchaser is simply a claim of the estate that the Trustee or DIP may pursue. If the situation is reversed, and the debtor has been paid for the widgets but has not supplied them, the bankruptcy serves as a breach of the contract and entitles the counterparty to pursue damages as a claim against the estate. That claim will likely be paid out in pennies on the dollar." Paul F. Kirgis, *Arbitration, Bankruptcy and Public Policy: A Contractarian Analysis*, 17 Am. Bankr. Inst. L. Rev. 503, 509, Winter 2009. The Fourth Circuit has held that the sole remaining obligation of one party to make payment does not render the contract executory. *Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1046 (4th Cir.1985).

*Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.)*, 371 B.R. 412, 422- 23 (BAP 9th Cir. 2007).

   3.  Just as the Code does not define "executory contract," neither does it define what is meant by an "executory contract of a debtor."  There is no apparent requirement in the statute that the debtor must be a party to a contract in order for the contract to be property "of the debtor" as a basis for the filing of a motion to assume or reject the contract.  In its definition of "property of the estate," Section 541(a) of the Code includes "all legal or equitable interests of the debtor in property as of the commencement of the case."  *Cohen v. Ulz (In re Ulz)*, 388 B.R. 865, 868 (Bankr. N.D. Ill. 2008).  Whether a debtor possesses an interest in property and the nature of that interest is a question of state law.  *Wells Fargo Fin. Acceptance v. Price (In re Price)*, 562 F.3d 618, 624 (4th Cir. 2009), citing *Butner v. United States*, 440 U.S. 48, 57, 99 S.Ct. 914, 59 L. Ed.2d 136 (1979).

   4.  On the petition date, November 23, 2007, the agreements between Moody's and FIC were executory contracts, and therefore subject to Section 365, because Moody's owed FIC the continuing duties of allowing it the use of the software granted under the license and of providing maintenance and service to FIC of the licensed equipment.  *Cf. Lubrizol Enter., Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1045-6 (4th Cir.1985) (technology

15

licensing agreement was executory contract because "RMF owed Lubrizol the continuing duties of notifying Lubrizol of further licensing of the process and of reducing Lubrizol's royalty rate. . ." and "additional contingent duties of notifying it of suits, defending suits and indemnifying it for certain losses," while Lubrizol owed RMF duties of paying royalties, to "deliver written quarterly sales reports and keep books of account subject to inspection," and "to keep all license technology in confidence for a number of years.").

## STANDING AND SUBJECT MATTER JURISDICTION TO REJECT AN EXECUTORY CONTRACT TO WHICH THE DEBTOR WAS NOT A PARTY

5. The rejection of executory contracts and unexpired leases of personal property in Chapter 11 proceedings is governed by Section 365(d)(5).[9]

---

[9]Section 365(d)(5) provides, as follows:

(5) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

6. Section 365(a) of the Bankruptcy Code provides that a trustee in bankruptcy, (which equates to a debtor-in-possession), "may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). "Rejection can be described functionally as non-assumption, such that a trustee's decision not to assume an executory contract means only that the asset, i.e. the continued performance of the non-debtor, will not be a part of the bankruptcy estate. Once the determination not to assume a contract has been made, and as set out in § 365(g), the contract is treated as if it had been breached just before the bankruptcy petition was filed. . . A purpose of § 365 is to avoid giving administrative priority to executory contracts that are not a good bargain for a debtor's estate." *In re Alongi*, 272 B.R. 148, 153 (Bankr. D. Md. 2001) (citations omitted).

7. In the instant case, rightly or wrongly, Moody's demanded payment under the contract from FMC, even though the debtor was not the contracting party but merely the subsidiary of FIC, the contracting party. Notwithstanding Moody's mistaken assertion that the debtor *was* the contracting party, the debtor might be obligated to perform the contract under various scenarios, either as an agent of FIC,[10]

---

11 U.S.C. § 365(d)(5).

[10]*See Canaday Cooler Co., Inc. v. Staten Island Shipbuilding Co.*, 234 A.D. 451, 255 N.Y.S. 699 (1932) (evidence should have been submitted to jury that

as its alter ego or as its affiliate.[11]  The debtor's mere possession of the goods subject

to the agreements, coupled with Moody's demand for payment and the possibility that

the debtor had somehow succeeded to the rights and liabilities of FIC under the

agreements provided a sufficient basis for the debtor to file the rejection motions.

Therefore, employing the Countryman definition, this Court has determined that the

term "executory contracts of the debtor" denotes those contracts that are subject to

assumption or rejection in which performance remains due by the debtor and the other

contracting party regardless of whether the debtor was a party to the contracts so long

as some basis existed to believe that the debtor might be legally obligated to perform

under the contracts.  The debtor's reasonable, good faith belief that it might be liable

to perform the subject executory contracts, based particularly upon Moody's demand

---

supported theory that parent corporation not a party to a contract made by its
subsidiary was liable for breach of contract as agent of contracting party).

[11]*See Data Probe, Inc. v. 575 Computer Svs., Inc.*, 72 Misc. 2d 602, 607, 340
N.Y.S.2d 56 (1972) ("Whether the second corporation is denominated 'agent,' 'alter
ego,' or 'instrumentality,' of the parent, the essential point is that the courts will not
allow 'a perversion of the privilege to do business in a corporate form," *citing Berkey
v. Third Av. Ry. Co.*, 244 N.Y. 84, 155 N.E. 58, 59 (1926), holding parent corporation
liable for breach of contract by subsidiary.).  *See also Kopolow v. P.M. Holding Corp.
(In re Modern Textile, Inc.)*, 739 F.2d 308, 310 (8th Cir.1984) (change of corporate
name did not bar second-name corporation from establishing that it was successor in
interest entitled to enforce contract as successor of first-name corporation).

18

for performance, supports the finding that the debtor had standing to reject the agreements with Moody's.[12]

8.  The debtor's standing to reject executory contracts in this case furnished the bankruptcy court with the subject matter jurisdiction necessary to consider whether to permit the contracts to be rejected. The standard for permitting the rejection of an executory contract is whether it is in the debtor's best interest in the exercise of its business judgment, which is not an onerous standard. See 3 COLLIER ON BANKRUPTCY, ¶ 365.03[2] (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2009); *Lubrizol*, 756 F.2d at 1046-47.

9.  Therefore, the debtor was justified in including the subject contracts in the omnibus rejection motions. The debtor's good faith inclusion of the contracts in the rejection motions and Moody's failure to object justified this Court's granting of the order of rejection, which order of rejection was effective as to the debtor.

---

[12]By implication, the effect of this finding is that the underlying contracts need not turn out to be executory or even be legally binding on the debtor at the time the motion for rejection was filed in order for the debtor to have standing to bring the motion. This is true because the rejection proceeding is summary in nature and the validity of the underlying contract is not a part of the determination at this stage. *See Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095, 1099 (2d Cir.1993) (exercise of business judgment would be unnecessary were the bankruptcy court permitted "to rule conclusively on a decisive issue of breach of contract" at this stage.).

## *BINDING EFFECT OF THE REJECTION ORDER UPON THE PARTIES*

10.   The effect of rejecting executory contracts is that the debtor's estate did not assume the burdens under the contracts, but may be liable for damages for breach of contract.[13]

---

[13]As explained more than 20 years ago,

Rejection is not the power to release, revoke, repudiate, void, avoid, cancel or terminate, or even to breach, contract obligations. Rather, rejection is a bankruptcy estate's election to decline a contract or lease asset.  It is the decision not to assume, not to obligate the estate on the contract or lease as the price of obtaining the continuing benefits of the non-debtor party's performance.  That decision leaves the non-debtor in the same position as all others who have dealt with the debtor, by giving rise to a presumption that the debtor has "breached"—
i.e., will not perform — its obligations.  The debtor's obligations are unaffected, and provide the basis for a claim.

Profound and pervasive confusion surrounds those simple principles.  Some of the confusion results from the misleading connotations of the terms "rejection" and "breach," their conceptual origins now largely forgotten.  Much of the confusion follows from focusing on the question of which contracts are "executory."  To ask that question is to suggest irresistibly that rejection must be an important "power" that the "executory" contracts definition serves to limit, which in turn suggests that the definition surely must reflect some important bankruptcy policy, rejection its champion.

But all of that is aura, not essence.  The definition in fact serves the rather pedestrian function of identifying a type of asset that happens to be intertwined with a liability.  Executory contracts doctrine simply protects the estate from that liability unless it is knowingly assumed as the price of obtaining the asset.  In situations where the liability is not assumed, the doctrine is designed to make the happenstance of

11.  The debtor's rejection of the contracts had no effect whatsoever with respect to any performance obligations of other parties to the agreements, including FIC.  *Kopolow v. P.M. Holding Corp. (In re Modern Textile, Inc.)*, 900 F.2d 1184, 1191 (8th Cir. 1990) (rejection of a sublease by the trustee did not discharge the liability of a guarantor of the lease obligation).

12.  The Plan Trust has standing to object to Moody's application for an administrative claim, *see* Finding of Fact No. 6, and is not estopped from contesting Moody's damage claim because the debtor would not be estopped from doing so.  The debtor's rejection of the agreements is not an automatic acknowledgment that it was

---

"executoriness" irrelevant to the treatment of the non-debtor party. Thus, when the estate wishes to reject, the definition of an "executory" contract is all but meaningless:  The non-debtor party to a rejected "executory" contract is in the same position as the non-debtor party to a non-"executory" contract, and the superfluous "rejection" of a non-"executory" contract is a case of harmless error.

The confusion surrounding rejection has led, though, to the mistaken view that rejection of an "executory" contract somehow abates or alters contract liabilities, thereby diminishing the non-debtor's rights. Relatedly, the confusion has yielded the insupportable notion that rejection of a contract also serves as an avoiding power which clears the estate's title to any underlying asset to which the contract relates.

Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding Rejection*, 59 U. COLO. L. REV. 845, 931-2 (1988).

legally obligated to perform the agreements or that it was liable for damages for failing to perform them, i.e. for their breach.

13.  Because Moody's had no right to rely on the debtor's rejection as entitling it to damages *per se*, the Plan Trust is not estopped from objecting to the claim.[14]

14.  However, just as the debtor is bound by its rejection of the agreements as approved by this Court, the Plan Trust is also bound by reason of the application of the doctrine of *res judicata*, and therefore, may not contest the validity of the debtor's rejection of the agreements.[15] *Nicholas v. United States*, 384 U.S. 678, 693, n. 27, 86 S.Ct. 1674, 16 L. Ed.2d 853 (1966) ("as the successor in interest, the trustee is bound by all authorized acts of the debtor in possession").  *Cf. Zurich Am. Ins. Co. v. Int'l Fibercom, Inc. (In re Int'l Fibercom, Inc.)*, 503 F.3d 933, 944-5 (9th Cir. 2007) (in

---

[14]Despite Moody's assertion to the contrary, neither the debtor nor debtor's counsel was obligated to respond to Moody's demand for payment. *Cf. In re Jackson*, 98 B.R. 738 (Bankr. D. Md. 1986) (debtor's counsel was not obligated to respond to creditor's letter requesting information on the status of Chapter 11 case).

[15]*Cf. In re Teligent, Inc.*, 326 B.R. 219 (S.D. N.Y. 2005), cited by Moody's for the proposition that the Plan Trust is equitably estopped from arguing that the rejection was a nullity.  *Teligent* is inapposite, because there the debtors' assumption of executory contracts of medical insurance, coupled with the insurers' change of position in reasonably relying on the assumption, equitably estopped the confirmed Chapter 11 plan's representative from moving to have the assumption order rescinded. This is a subtle distinction, but an important one.  In the present case, Moody's has shown no change of position or reasonable reliance upon the debtor's rejection of the agreements.

22

extraordinary circumstances, a debtor's successor trustee had standing to move to vacate an order that granted the debtor's motion to assume an executory contract where the contract turned out not to have been executory).  No such extraordinary circumstances have been demonstrated to exist in the instant case to vacate the order authorizing the rejection of Moody's contracts by FMC.

### IN THE ABSENCE OF PROOF THAT THE DEBTOR WAS LIABLE FOR PERFORMANCE OF THE REJECTED CONTRACTS, THE REJECTION OF EXECUTORY CONTRACTS BY A DEBTOR THAT WAS NOT A PARTY TO THE CONTRACTS DID NOT GIVE RISE TO ANY CLAIM, INCLUDING ONE FOR AN ADMINISTRATIVE EXPENSE

15.  When a debtor rejects an executory contract, the other party to the contract is entitled to assert an unsecured claim for consequential damages for breach of contract that resulted from the contract's rejection, and possibly an administrative expense claim as well for unpaid defaults from the petition date until the date of rejection.[16]

16.  In order to qualify as an administrative expense claim, i.e. "as an actual and necessary administrative expense, '(1) the claim must arise out of a post-petition

---

[16]Pursuant to Section 365(g)(1), the rejection of executory contracts or leases is treated as a breach that is deemed to have occurred prepetition, giving rise to an unsecured claim for damages.  In addition, the rejection of an executory contract or lease of personal property may give rise to an administrative expense claim for unpaid postpetition payments due from the debtor from the date the bankruptcy case was filed down to the date of rejection.  *See* 1 Epstein, Nickles & White, *Bankruptcy* §§ 5-15-7, pp. 437-9, 451-2 (West 1992).

transaction between the creditor and the debtor-in-possession (or trustee) and (2) the consideration supporting the claimant's right to payment must be supplied to and beneficial to the debtor-in-possession in the operation of the business.'" *Devan v. Simon DeBartolo Group, L.P. (In re Merry-Go-Round Enter., Inc.)*, 180 F.3d 149, 157 (4th Cir.1999), quoting *In re Stewart Foods, Inc.*, 64 F.3d 141, 145 n. 2 (4th Cir.1995) ( citing *Trustees of Amalgamated Ins. Fund v. McFarlin's, Inc.*, 789 F.2d 98, 101 (2d Cir.1986)). In the peculiar circumstances presented here, no such administrative expense claim has been proven because of the claimant's failure to prove that FMC was at all obligated to perform the contract.[17]

### *ADMINISTRATIVE CLAIMANT UNDER A REJECTED CONTRACT BEARS THE BURDEN OF PROVING DAMAGES AND LIABILITY*

17.  The rejection of an executory does not in and of itself create liability for an administrative claim in the absence of proof of damages and liability. *See Durkin v. Benedor Corp. (In re G.I. Indus., Inc.)*, 204 F.3d 1276, 1282 (9th Cir. 2000), where the following statement is made:

---

[17]In *CIT Comm. Fin. Corp. v. Midway Airlines Corp. (In re Midway Airlines Corp.)*, 406 F.3d 229 (4th Cir. 2005), the Fourth Circuit held a debtor liable for unpaid postpetition rent as a Section 503(b) administrative expense claim under a rejected executory lease of personal property pursuant to Section 365(d)(10) (now recodified as Section 365(d)(5)), where the debtor had failed to make such payments before rejecting the lease, regardless of whether the personal property was actually used by the debtor or conferred a benefit upon the estate.  As will be seen, this opinion is not applicable where no such liability of the debtor under the contract has been proven.

24

The rejection of an executory contract creates a statutory breach under section 365(g). However, the statutory breach is not final and conclusive because it is still subject to the claims process under section 502. Therefore, in accordance with the statutory language and the structure of the Bankruptcy Code, a bankruptcy judge may adjudicate the validity of an executory contract pursuant to a valid proof of claim even after the trustee has rejected that contract.

*Id.* This Court's "authority to consider the validity of a rejected contract is not a jurisdictional matter. Rather, the question of whether the bankruptcy court may inquire into the validity of the rejected contract is a substantive issue of statutory interpretation. . ." *Id.*, at 1279. "[R]ejection does not affect the parties' substantive rights under the contract." *Cinicola v. Scharffenberger*, 248 F.3d 110, 119, fn. 8 (3d Cir. 2001), *citing* 3 COLLIER ON BANKRUPTCY ¶¶ 365.09, 365.09[1] (Lawrence P. King ed., 15th ed. 1999).

18.    Moody's bears the burden of proof that its claim is entitled to administrative priority, *Devan*, 180 F.3d at 157, that it sustained damages as the result of the rejection and that the debtor is liable for damages for breach of the agreements. Moody's has failed to advance any theory or even to allege any basis that would obligate the debtor to perform the agreements, other than the fact that FMC had bare possession of some software after its former parent, FIC, ceased to exist.[18] As asserted

_____

[18]Bare possession by FMC of certain goods that were returned to Moody's did not give rise to an administrative claim against the debtor's estate. The debtor had no obligation to tender payment to Moody's merely because the debtor's former parent

and proven by the Plan Trust, FMC neither contracted for the use of Moody's property or services, nor did FMC use them or have any reason to use them. Transcript at 23:22-23. Counsel for the Plan Trust indicated that FIC did not use the software after October 2007, that FIC's use of the software had nothing to do with the business of FMC and that Moody's supplied no technical support to FMC at any time under the service agreement. Four or five employees of FIC used the software but none of FMC's employees knew how to use the software. Transcript at 26:15-18.[19] Moreover, FMC never tendered any payments to Moody's under the agreements. Until the equipment was discovered in storage boxes, FMC was unaware that the equipment in question was on the premises.

19. The terms of a license agreement of intellectual property control the rights and obligations of a subsidiary of a licensee. *In re Access Beyond Technologies, Inc.*, 237 B.R. 32, 40-41 (Bankr. D. Del. 1999) (rights of licensee's subsidiaries pursuant to patent cross-licensing agreement were set forth in the licensing agreement and

_____

lost its separate corporate existence after being taken over by C-BASS.

[19]Had the debtor *assumed* rather than *rejected* the contract, there was no benefit received by the debtor's estate postpetition as required by Section 503 in order to qualify the claim as an administrative expense. In order to confer such a benefit, there must be an "*actual use* of the creditor's property by the debtor, thereby conferring a *concrete benefit* on the estate" to qualify a claim for administrative priority. *Ford Motor Credit Co. v. Dobbins*, 35 F.3d 860, 866 (4th Cir. 1994) (Emphasis in original).

"were derivative of, and dependent upon, Hayes [the licensee] having rights"). The licensing agreement in the instant case did not provide any rights to FMC as the subsidiary of FIC to use Moody's property. "It is a fundamental precept of corporate law that each corporation is a separate legal entity with its own debts and assets, even when such corporation is wholly owned by another corporate entity." *Kreisler v. Goldberg (In re Kreisler)*, 478 F.3d 209, 213 (4th Cir. 2007), *citing Turner v. Turner*, 147 Md. App. 350, 809 A.2d 18, 61 (2002) and *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d, 56, 62 (4th Cir. 1993). FIC was a real estate investment trust and FMC funded and sold mortgages. Transcript at 17:12-15. FMC was a limited liability company (LLC) under Maryland law, which "is treated as a separate legal entity for purposes of liability and property ownership." *Kreisler*, 478 F.3d at 213.

20. It would be an anomalous result were the debtor to be held liable for administrative expenses to Moody's on the sole ground that the debtor rejected a contract to which it was neither a party nor otherwise liable; on contracts for the breach of which the debtor would have had no liability to the claimant for unpaid amounts outside of bankruptcy; for which amounts the claimant now asserts an administrative claim in bankruptcy from the petition date to the date of rejection, merely because, as Professor Andrews stated, the debtor made "the decision not to assume, not to obligate the estate on the contract or lease." Andrews, *supra*.

27

WHEREFORE, the objection of the FMC Plan Trust to Moody's application for an administrative claim in the amount of $45,338.76 will be SUSTAINED and the application will be DENIED.

***ORDER ACCORDINGLY.***

cc:    Joel I. Sher, Esquire
Diarmuid F. Gorham, Esquire
Shapiro Sher Guinot & Sandler
36 S. Charles Street
Baltimore, Maryland  21201-3146
Counsel to the debtor

J. Daniel Vorsteg, Esquire
Chad Toms, Esquire
Whiteford, Taylor & Preston
7 St. Paul Street
Baltimore, Maryland  21202
Counsel to the FMC Plan Trust

James L. Marketos, Esquire
Laina Lopez, Esquire
 Berlinier, Corcoran & Rowe, LLP
1101 17th Street, NW
Suite 1100
Washington, D.C.  20036

Christopher R. Belmonte, Esquire
Pamela A. Bosswick, Esquire
Satterlee, Stephens, Burke & Burke, LLP
230 Park Avenue
New York, New York 10169

Counsel to Moody's Wall Street Analytics, Inc.

Hugh M. Bernstein, Esquire
 Office of the United States Trustee
Garmatz Federal Courthouse, Suite 2625
101 West Lombard Street
Baltimore, Maryland  21201

Jeffrey Neil Rothleder, Esquire
Robert M. Hirsch, Esquire
Arent Fox LLP
1675 Broadway
New York, New York  10004

Christopher J. Giaimo, Esquire
Arent Fox LLP
1050 Connecticut Ave., NW
Washington, D.C.  20036

Counsel to the Official Committee of Unsecured Creditors